UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JENA L. LATIF, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:19-cv-03851-SEB-MPB |
| | ) | |
| FCA US, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on Defendant's Motion for Summary Judgment
[Dkt. 49], filed on April 26, 2021. Plaintiff Jena L. Latif has brought this action against
her former employer, Defendant FCA US, LLC ("FCA"), alleging that FCA
discriminated and retaliated against her because of her race (African American) and
engagement in statutorily protected activity, respectively, in violation of the Civil Rights
Act of 1964 ("Title VII") and 42 U.S.C. § 1981. For the reasons detailed below, we
<u>GRANT</u> Defendant's Motion for Summary Judgment.

**<u>Factual Background</u>**

Ms. Latif was hired by FCA, an automaker, in June 1995 and worked throughout
her tenure with the company as a bargaining unit employee. When she was first hired,
Ms. Latif worked at FCA's Kokomo Transmission Plant and then moved a few years later
to FCA's Indiana Transmission Plant 1. Ms. Latif held various positions with FCA,
including Production Worker, Training Coordinator, Assembly, and Team Leader, but at
all times relevant to this litigation, she worked as a Receiving Clerk in FCA's Products

Control Department, which is responsible for managing the flow and supply of incoming and outgoing parts.

Ms. Latif's direct supervisor was Manuel Rangel, who, in turn, was supervised by the Products Control Department Business Unit Leader, Dawn Sladinski.  Ms. Sladinski was responsible for managing all the Receiving Clerks on FCA's Production Control Floor.  Lawrence Wilson, a Labor Relations Supervisor, was responsible for overseeing discipline and terminations in the FCA plant where Ms. Latif worked.  Mr. Wilson reviewed disciplinary write-ups and termination notices to ensure that discipline was being applied consistently throughout the plant.  Although he lacked personal knowledge of the circumstances underlying the disciplinary and termination notices he reviewed, he based his decisions on the information he received from supervisors or other employees in the departments where the disciplined or terminated employees worked.

**Defendant's Conduct Standards and Anti-Discrimination and Harassment Policies**

FCA maintains a Discrimination and Harassment Prevention Policy with which its supervisors and management team are expected to be familiar.  The policy is reviewed by these managers on an annual basis through on online program.  FCA also maintains and publicizes a policy regarding the reporting of claims of discrimination, has a Corporate Diversity Board, and provides diversity training within its plants through the dissemination of training materials, such as books and video clips.

All FCA's employees are subject to the company's Standards of Conduct ("SOC").  As relevant to this litigation, Rule 5 of the SOC provides that the "[f]ailure to exert normal effort on the job …" is considered by FCA to be a "serious inappropriate or

destructive behavior[]" that "depending on the severity and nature of the offense, … may result in discipline, up to and including termination of employment." Dkt. 51-4. When assessing whether an employee is satisfying Rule 5 of the SOC, FCA considers the length of the employee's tenure with the company and whether the employee typically completes their duties in a timely manner or regularly fails at certain aspects of the position. Failing to complete a particular task in a timely manner, or in the specific time allotted for that task is a violation of SOC Rule 5. Accordingly, a Receiving Clerk or other employee responsible for receiving items who fails to receive those items in a timely manner would be in violation of SOC Rule 5.

FCA employees are also all subject to the negotiated progressive discipline plan contained in the collective bargaining agreement between FCA and the United Auto Workers Union. The progressive discipline plan is comprised of the following six steps: verbal warning (Step 1), written warning (Step 2), written warning and counseling (Step 3), 3-day disciplinary layoff (Step 4), 30-day disciplinary layoff (Step 5), and finally, termination (Step 6).

**Plaintiff's Job Duties**

During the relevant time period, FCA employed a total of five Receiving Clerks in the Products Control Department—two who worked First Shift, two who worked Second Shift, and one who worked Third Shift. Ms. Latif worked ten-hour shifts, Monday through Thursday, as the sole Receiving Clerk on the South Dock. Justin Cole was the North Dock Receiving Clerk who shared the day shift with Ms. Latif. Ms. Latif was the only Receiving Clerk who is Black.

3

As a Receiving Clerk, Ms. Latif was responsible for checking in automobile parts when the parts arrived at the plant.  That process involves several steps.  As parts are unloaded from the truck trailer, the on-duty Receiving Clerk first checks that the parts received match those listed on the packing slip for the order.  The Receiving Clerk then tags the parts, which involves placing stickers on each skid of parts that identifies the partial part numbers, quantity, and date of arrival.  Finally, the Receiving Clerk is required to manually enter the parts into FCA's computer system to officially receive them.  On shifts without a Receiving Clerk, employees in other positions may sign to indicate that parts were delivered and then set aside the paperwork to be completed by the Receiving Clerk arriving the next day, but these other employees do not have access to receive the parts into the system themselves.

FCA's Planning and Timing Department relies on Receiving Clerks to accurately input parts inventories into the system and usually discovers when errors are made, or parts that are not received, and brings such discrepancies to the attention of management.  FCA can usually discern who is responsible for a discrepancy by determining which Receiving Clerk was on duty at the time the unreceived parts arrived.  Another way FCA can determine which employee is responsible for unreceived parts is to review the T-ID number associated with those parts on the computer, as each FCA employee who uses a computer to perform their job duties is assigned a unique T-ID number.  Not every error that is discovered requires discipline, however.  The decision whether to discipline depends on a variety of factors, including the severity of the error at issue, the number of prior errors the particular employee has made as well as whether the employee who made

the error was a Receiving Clerk or another employee who was merely filling in on that shift.

In addition to receiving in parts, Receiving Clerks are responsible for receiving in "dunnage," which consists of the containers or pallets that come along with the parts. Because dunnage is not used in the assembly process, FCA incurs no additional costs associated with dunnage-related receiving errors or delays. Dunnage errors or delays are common and typically do not result in the same level of disciplinary action issued for parts-related receiving errors. Although it was routine for Ms. Sladinski to issue a daily report or recon list about following up on unaccounted for dunnage, she usually would not be aware of which employee was responsible for those outstanding or unreceipted items.

**Plaintiff's Job Performance and Discipline at Steps 1 Through 4**

Ms. Latif maintains that in all respects she satisfactorily performed her duties as Receiving Clerk. FCA, however, claims that Ms. Latif struggled to perform her duties as Receiving Clerk by making more frequent and consistent errors than any of her co-workers holding the same position. Specifically, FCA maintains that Ms. Latif regularly failed to perform her duties in a timely manner and to properly tag and receive items into the computer system as required. As a result, on several occasions while working under Mr. Rangel's supervision, Ms. Latif required discipline.

On April 6, 2017, FCA claims that Ms. Latif failed to receive shipments of parts on three separate occasions, prompting Mr. Rangel to issue a Step 1 verbal warning to her under the progressive discipline policy for failing to exert "normal effort" on the job in

violation of SOC Rule 5.  Ms. Latif denies that she failed to receive the parts for which she was disciplined.

The next month, on May 16, 2017, Mr. Rangel issued Ms. Latif Step 2 discipline for violating the "normal effort" requirement of SOC Rule 5 by failing to begin tagging a shipment of parts until it had been sitting on the dock for more than an hour.  According to Mr. Rangel, if a Receiving Clerk is aware of any untagged parts, the Receiving Clerk's responsibility is to prioritize the tagging of the parts to ensure that task is accomplished before the completion of other job duties.  Ms. Latif denies that the parts sat on the receiving dock for an hour before she began tagging them.  Upon being questioned at the time by Ms. Sladinski, Ms. Latif explained that there were three trailers of parts that had to be tagged and that it was simply taking longer than usual to tag them because of the number of parts that required tagging.

Approximately seven months later, on December 19, 2017, Mr. Rangel issued Step 3 discipline to Ms. Latif for another SOC Rule 5 violation, following Mr. Rangel's determination that Ms. Latif had failed to exert normal effort on the job based on information from the Planning and Timing Department that she had not "received in" a full shipment of material, which meant there were unreceived parts that had not been accounted for in the system.  Mr. Rangel's original write-up referenced that Ms. Latif had failed to "receive in" parts labeled 501s on December 7, 2017.  Ms. Latif notified Mr. Rangel that she did not sign for and was not responsible for the 501s on December 7, showing him a sign-in list reflecting that another FCA employee, Brian Means, had

signed for the 501s on that date.  Mr. Rangel then revised his write-up to state that Ms. Latif had failed to sign in the 501s on December 11, 2017.

Mr. Rangel issued Step 4 discipline to Ms. Latif on March 8, 2018, again for failing to exert normal effort in violation of SOC Step 5, due to her failure to "receive in" parts 584AD on March 1, 2018.  Pursuant to Step 4 of the progressive discipline plan, Ms. Latif received a three-day disciplinary layoff based on Mr. Rangel's write-up.  Ms. Latif denies that she failed to "receive in" the parts as described in the write-up.

**Plaintiff's Step 5 Discipline**

On March 20, 2018, approximately two weeks after receiving Step 4 discipline, Mr. Rangel again determined that Ms. Latif had violated SOC Rule 5 by failing to exert normal job effort after she failed to receive parts into the mainframe system, which caused certain inventory discrepancies.  This write-up moved Ms. Latif to Step 5 discipline which, pursuant to the progressive discipline policy, subjected her to a 30-day disciplinary layoff.  Ms. Latif denies that she was responsible for the unreceived parts and has testified that she again showed Mr. Rangel a document proving that she was not the FCA employee responsible for the March 20, 2018 unreceipted parts.

Ms. Sladinski and Mr. Rangel met with Ms. Latif to inform her of the 30-day layoff.  During that meeting, in lieu of the 30-day disciplinary suspension, FCA management offered to permit Ms. Latif to move to a different position of her choice on the same shift and at the same rate of pay as the Receiving Clerk position with the ability to start over at Step 1 of the progressive disciplinary policy.  Specifically, FCA offered Ms. Latif the opportunity to pick any open job in the Product Control Department without

proceeding through the bidding process that allows other employees to bid on the vacant position as well.  Both Ms. Latif's union and FCA's Human Resources Department were in agreement regarding her transition to another position with the company.  Ms. Latif declined this offer, however, on grounds that it would have required her to accept less desirable duties than Receiving Clerk, such as a forklift or trigger driver.  Once Ms. Latif refused to step down from the position of Receiving Clerk and accept another position within the company, Ms. Sladinski disqualified her from continuing in the Receiving Clerk position.  Mr. Wilson then approved the 30-day disciplinary layoff.

**Plaintiff's Step 6 Termination**

On May 10, 2018, Ms. Latif reached Step 6 of the progressive disciplinary policy and was terminated in line with that policy after she once again was found to have violated SOC Rule 5 – Failure to Exert Effort.  Specifically, Ms. Latif marked a packing slip as received on April 26, 2018, but failed to input those parts into FCA's mainframe computer system until April 30, 2018.  FCA considered such a four-day gap between the receipt of the parts and the receiving of those parts in the computer system a violation of SOC Rule 5.  Ms. Latif has testified that she did not immediately transfer the information for the parts from the packing slip in question into FCA's computer system because the paperwork had been removed from her work area and was never returned.  Ms. Sladinski was involved in the decision to terminate Ms. Latif's employment and the termination was approved by Mr. Wilson.  After Ms. Latif's termination, FCA offered to reinstate her as part of the grievance process with the union, but she refused the terms of that offer.

**Other Employees' Performance Issues**

Marella Williams has testified by affidavit that, from 2002 to 2017, as a follow-up analyst in FCA's Planning and Timing Department, she worked with most, if not all, of the Receiving Clerks.  According to Ms. Williams, it was a common error by Receiving Clerks to fail to "receive in" parts.  Specifically, she had observed that Receiving Clerks would on a monthly basis fail to receive in parts to FCA's computer system.  Although she retired in 2017, more than a year before Ms. Latif's suspension and termination, Ms. Williams testified that she was "shocked" when she heard Ms. Latif was terminated for failing to receive in parts because other Receiving Clerks routinely made the same types of errors when she worked at FCA but were not terminated.

In line with Ms. Williams's testimony, according to Ms. Latif, during the time she held the position of Receiving Clerk, she frequently had to receive in parts for other Receiving Clerks, including Chris Humbert, Nick Gaddis, Vincent Duke, and Justin Cole, all of whom are white, yet they were never disciplined for such errors.  Ms. Latif did not retain or present documentation of all these incidents as evidence in this lawsuit, but has presented certain documents that she claims pertain to receiving errors made by other Receiving Clerks, the details of which are recounted below.

On October 6, 2016, Shara Alvarado, an employee in the Planning and Timing Department, emailed all Receiving Clerks, supervisors, and managers in Products Control indicating that a batch of expedited parts assigned to Mr. Humbert had not been received in properly and needed to be attended to as soon as possible.  Exh. 31 to Rangel Dep.  On December 5, 2017, in an email to several members of FCA management, including Ms.

Sladinski, Mr. Humbert stated that he "didn't catch it in time" that FCA had received in 72 parts in a particular shipment, when it should have received in only 54, creating a discrepancy. Exh. 70 to Sladinski Dep. There is no evidence that Mr. Humbert was disciplined for either of these receiving errors.

On another occasion in June 2017, Ms. Sladinski contacted Ms. Latif regarding a batch of missing parts. After speaking with Ms. Sladinski, Ms. Latif located the paperwork for the missing parts, which had been filed away. According to Ms. Latif, the missing parts filled an entire semi-trailer and had arrived on the dock on June 12, 2017, but had not been received into the computer system until Ms. Latif did so on June 20, 2017, in response to Ms. Sladinski's inquiry. In a June 20, 2017 email, Mr. Gaddis explained that he was the one who had filed away the paperwork without receiving in the parts because when the shipment arrived, it did not have a packing slip. He stated that he set the paperwork aside because he had planned to have another employee help him and apologized for filing it without receiving in the parts. Exh. 73 to Sladinski Dep. According to Ms. Latif, when she informed Ms. Sladinski that Mr. Gaddis had caused the error, he was not disciplined; instead, Ms. Sladinski merely commented that Mr. Gaddis had been overwhelmed. Latif Aff. ¶ 37.

On two separate occasions, once in June 2017, and again in October 2017, Mr. Duke failed to receive in parts until five days after the respective shipments had arrived. *See* Exh. 23 to Rangel Dep. The record does not reflect that Mr. Duke was disciplined on either occasion. Mr. Duke was, however, disciplined multiple times between April 2015 and June 2019 for various violations, including safety violations and at least two SOC

10

Rule 5 violations for failure to exert normal effort on the job that were issued by Ms. Sladinski.

Ms. Latif also produced documents that she claims show that Mr. Cole also failed to completely receive in shipments on five occasions between October 2016 and April 2017.  *See* Exh. 22 to Rangel Dep.  Specifically, the document indicates that in October 2016, a shipment of parts assigned to his T-ID number was not completely "received in" until six days after the shipment arrived.  In February 2017, a shipment assigned to his T-ID number was not "received in" until one day after its arrival.  In March 2017, a shipment assigned to his T-ID number was not fully "received in" until it was two days old.  In April 2017, two shipments assigned to his T-ID number were not completely "received in" for one day and six days, respectively.  There is no evidence that Mr. Cole was disciplined on any of these occasions.

In addition to the above recounted incidents, Ms. Latif testified that she had informed her direct supervisor, Mr. Rangel, as well as other members of FCA's management team and the Planning and Timing Department of various receiving errors that occurred in 2017, including failures by other Receiving Clerks to properly stamp and receive in parts, errors relating to torque converters that had not been given the proper supplier code, which needed to be corrected in the computer system, and packing slips from a trailer left from the night shift with no verification of the trailer parts.  The record also contains numerous emails sent among the five Receiving Clerks, team leaders, and members of management on various dates throughout 2017 and 2018, generally

11

discussing receiving errors related to parts and dunnage, in which no particular Receiving Clerk was singled out for allegedly having committed the errors.

**Plaintiff's Prior Charges of Discrimination and Title VII Lawsuit**

In August 2014, Ms. Latif filed a written complaint with FCA alleging that she was being subjected to race and sex discrimination and harassment by her then-supervisor, who, to our knowledge, is not involved in the incidents underlying the instant litigation.  Mr. Wilson, in his role as Labor Relations Supervisor, received a copy of Ms. Latif's complaint.  Approximately eight months thereafter, in April 2015, Ms. Latif was demoted from her position of Team Leader to her present position of Receiving Clerk. Mr. Wilson was a member of the panel that made the demotion decision.

In September 2015, a few months after she was demoted, Ms. Latif filed a discrimination charge with the Equal Employment Opportunity Commission ("EEOC") alleging discrimination based on race, sex, and retaliation stemming from her demotion and other allegations.  She filed a second charge with the EEOC in 2016, alleging race, sex, and disability discrimination as well as retaliation.  Mr. Wilson testified that he cannot be certain that he received a copy of Ms. Latif's EEOC charges and/or was involved in responding to those charges.

In 2017, Ms. Latif filed a lawsuit against FCA based on the allegations set forth in her EEOC charge(s), alleging disability, race, and sex discrimination and that she was retaliated against for complaining of such discrimination.  Mr. Wilson has testified that he may have reviewed a copy of Ms. Latif's 2017 lawsuit prior to his having approved the decision to terminate her in 2018, but is unable to specifically recall.

**The Instant Lawsuit**

Ms. Latif filed her complaint in this action on September 11, 2019, after receiving her notice of right to sue from the EEOC on June 20, 2019.  She amended her complaint on December 20, 2019, alleging claims of race discrimination and retaliation under Title VII and § 1981.  On April 26, 2021, FCA moved for summary judgment on all claims. That motion is now fully briefed and ripe for ruling.

## Legal Analysis

### I.      Summary Judgment Standard

Summary judgment is appropriate where there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  A court must grant a motion for summary judgment if it appears that no reasonable trier of fact could find in favor of the nonmovant on the basis of the designated admissible evidence.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  We neither weigh the evidence nor evaluate the credibility of witnesses, *id.* at 255, but view the facts and the reasonable inferences flowing from them in the light most favorable to the nonmovant.  *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008).

### II.     Discussion

Ms. Latif alleges that FCA terminated her based on her race and in retaliation for her having engaged in protected activity, all in violation of Title VII and § 1981.  We consider Ms. Latif's Title VII and § 1981 claims together, as the statutes have "the same liability standards," and for simplicity's sake, refer only to Title VII unless otherwise

noted.  *Morris v. BNSF Ry. Co.*, 969 F.3d 753, 758 (7th Cir. 2020) (quoting *Walker v. Abbott Labs.*, 340 F.3d 471, 474 (7th Cir. 2003)).

An analysis of Ms. Latif's employment discrimination claims invokes the Seventh Circuit's decision in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016), which states that regardless of whether the court uses the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) or some other framework to evaluate a plaintiff's employment discrimination and retaliation claims, "the ultimate legal question 'is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.'"  *Reed v. Freedom Mortg. Corp.*, 869 F.3d 543, 547 (7th Cir. 2017) (quoting *Ortiz*, 834 F.3d at 765).  Under this "simplified" approach, the "[e]vidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence."  *Ortiz*, 834 F.3d at 765.

Applying these principles, we address Ms. Latif's claims in turn below.

**A.  Race Discrimination Claims**

Ms. Latif has chosen to frame her discriminatory discipline and termination claim using the *McDonnell Douglas* burden shifting method.  Under the *McDonnell Douglas* framework, a plaintiff must first establish a prima facie case of discrimination, which requires proof that the plaintiff: (1) was a member of a protected class; (2) adequately performed her employment responsibilities; (3) suffered an adverse employment action; and (4) received different treatment than similarly situated persons who were not

14

members of the same protected class. *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 790 (7th Cir. 2007) (citation omitted). If the plaintiff is able to make such a showing, the burden shifts to her employer to come forth with a "legitimate, non-discriminatory reason" for its actions. *Hill v. Potter*, 625 F.3d 998, 1001 (7th Cir. 2010). If the employer is able to do so, it will prevail unless the plaintiff presents evidence that the employer's given reason is merely a pretext for discrimination. *Serednyj v. Beverly Healthcare, LLC*, 656 F.3d 540, 551 (7th Cir. 2011) (citation omitted). Here, only the second and fourth elements of Ms. Latif's prima facie case are in dispute.

FCA contends that Ms. Latif cannot establish a prima facie case under the *McDonnell Douglas* framework because she cannot prove that she was adequately performing her job responsibilities at the time she was terminated or that similarly situated white employees were treated more favorably. Even if she could make such a showing, FCA maintains that it is still entitled to summary judgment because Ms. Latif has failed to show that its proffered nondiscriminatory reason for her termination, to wit, that she had repeatedly been disciplined for violating SOC Rule 5 by failing to timely receive in parts and had reached the sixth and final step of its progressive discipline policy is pretext for discrimination.

In response, Ms. Latif argues that she was unfairly disciplined because of her race and that similarly situated employees outside of her protected class who also frequently failed to timely receive in parts were, unlike her, never disciplined. Accordingly, Ms. Latif urges the Court to conclude that she has established the second and fourth prongs of her prima facie case of discrimination. She has relied on this same comparator evidence

to argue that FCA's purported nondiscriminatory reason for her termination, to wit, that she was not meeting its legitimate job expectations and had reached the final step of the progressive discipline policy, is a lie.  FCA rejoins that Ms. Latif has failed to establish that any of her purported comparators are in fact similarly situated to her; thus, she cannot establish a prima facie case of discrimination or prove pretext.

The Seventh Circuit has held that "[w]hen a plaintiff produces evidence sufficient to raise an inference that an employer applied its legitimate employment expectations in a disparate manner …, the second and fourth prongs of *McDonnell Douglas* merge."  *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002).  Similarly, where, as here, an employee argues that her employer is "lying about its legitimate employment expectations in order to set up a false rationale for terminating [her]," the second prong and the pretext question merge because the issue is the same, to wit, whether the employer is lying.  *Senske v. Sybase, Inc.*, 588 F.3d 501, 507 (7th Cir. 2009).  Under these legal principles, and because the issues are intertwined, Ms. Latif's employment discrimination case boils down to the issue of whether FCA's reason for terminating her was pretextual.

To establish pretext, a plaintiff must do more than demonstrate that an employer's reason for an adverse employment action was mistaken.  *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 696 (7th Cir. 2006) ("An employer's mistaken belief … is not unlawful, so long as the belief was honestly held.").  Rather, proof of pretext requires proof of a deliberate lie on the part of the employer.  *Id.*  To meet this burden, a plaintiff must "identify such weaknesses, implausibilities, inconsistencies, or contradictions" in the

employer's stated reason "that a reasonable person could find [it] unworthy of credence." *Harper v. C.R. England, Inc.*, 687 F.3d 297, 311 (7th Cir. 2012) (quotation marks and citation omitted).

The Seventh Circuit has recognized that more favorable treatment of similarly situated employees outside of the plaintiff's protected class can be evidence of pretext. *E.g.*, *Coleman v. Donahoe*, 667 F.3d 835, 857–58 (7th Cir. 2012); *see also Baker v. Macon Res., Inc.*, 750 F.3d 674, 677 (7th Cir. 2014) ("[S]elective enforcement … of a disciplinary policy can … show pretext.").  To prove pretext in this case, Ms. Latif relies exclusively on evidence that she claims establishes that similarly situated white employees routinely violated the same policies that she was accused of violating but were never disciplined.  Accordingly, she claims that FCA's claim that it terminated her for her policy violations must be pretext for discrimination.

To be considered similarly situated, an employee needs to be "'directly comparable' in all material respects" but need not be "identical in every conceivable way" to the plaintiff.  *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 895 (7th Cir. 2018) (citation omitted).  "[T]he similarly-situated inquiry is flexible, common-sense, and factual.  It asks essentially, are there enough common features between the individuals to allow a meaningful comparison?"  *Coleman*, 667 F.3d at 841 (quotation marks and citation omitted).  "In disparate-discipline cases such as this, a proposed comparator is similar if the employees were disciplined by the same supervisor, were subject to the same performance standards, and engaged in misconduct of 'comparable

17

seriousness.'"  *Levy v. Wilkie*, 841 Fed. App'x 987, 993 (7th Cir. 2021) (quoting *de Lima Silva v. Dep't of Corr.*, 917 F.3d 546, 559 (7th Cir. 2019)).

Here, Ms. Latif has not provided enough information about the employees she has identified as comparators (Mr. Humbert, Mr. Gaddis, Mr. Duke, and Mr. Cole) for the Court to determine whether any of these employees is in fact similarly situated to her. Most significantly, she has failed to show that her purported comparators engaged in conduct of comparable seriousness to hers.  *See Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletic Dep't*, 510 F.3d 681, 689 (7th Cir. 2007) ("In deciding whether two employees have engaged in similar misconduct, the critical question is whether they have engaged in conduct of comparable seriousness.").  Although she points to several emails and other inventory documents that she contends prove that these other employees failed on certain occasions to timely receive in parts but were not disciplined for those errors, those documents have been presented to us utterly devoid of context.  The emails and inventory documents cited by Ms. Latif do not identify, for example, the employee's job title or supervisor at the time of the alleged error(s), whether the supervisor was aware of the error(s), the severity, magnitude, or frequency of the error(s), or, in some cases, whether there was in fact an error at all.

As the proponent of the evidence, it is Ms. Latif's burden at summary judgment to establish that her purported comparators are in fact similarly situated, which includes showing that they engaged in similar conduct.  At best, the documents cited by Ms. Latif contain vague and ambiguous references to isolated incidents, which are not sufficiently explained to allow us to determine whether the errors allegedly depicted therein are of

18

comparable seriousness to her own.  This is particularly true given that the undisputed

evidence establishes that whether receiving errors were disciplined was dependent upon a

variety of factors, including the quantity of that employee's errors, the severity of the

error, whether the error involved parts or dunnage, and whether receiving in parts is one

of the employee's regular job duties or part of a temporary or fill-in arrangement, none of

which is revealed on the face of the documents or from any testimony adduced by Ms.

Latif.[1]  Accordingly, we are not able to conclude from this evidence that Ms. Latif was

similarly situated to her identified comparators.

    Moreover, in disparate discipline cases such as this, one of "the most-relevant

similarities" among valid comparators is the "disciplining supervisor." *de Lima Silva*,

917 F.3d at 559.  Here, Ms. Latif has failed to show that her direct supervisor, Mr.

Rangel, who was responsible for issuing her discipline at Steps 1 through 4 of the

progressive discipline policy that was the precursor to her eligibility for the 30-day

suspension and termination that she challenges in this lawsuit, supervised any of the other

---

[1] Ms. Latif testified by affidavit that, in addition to the incidents referenced in the emails and inventory documents discussed above, she had to receive in parts for her comparators on numerous other occasions because they had failed to do so.  Ms. Latif has also presented the affidavit of Ms. Williams, a long-time employee in FCA's Production Control Planning and Timing Department, who testified that the failure to receive in parts was a common occurrence among the Receiving Clerks and that she was "shocked" when she heard that Ms. Latif had been terminated for such a common error.  These general and conclusory statements, however, are not enough at the summary judgment stage to prove that Ms. Latif was treated less favorably than similarly situated white employees.  *See Sommerfield v. City of Chicago*, 863 F.3d 645, 649 (7th Cir. 2017) ("Summary judgment is not a time to be coy: '[c]onclusory statements not ground in specific facts' are not enough."); *see also Madlock v. WEC Energy Group, Inc.*, No. 16-CV-332-JPS, 2017 WL 149978, at *6 (E.D. Wis. Jan. 13, 2017) ("More importantly, [the plaintiff's] general averment that all billers made mistakes, without providing specific examples commensurate with her own extensive error—and discipline-ridden history, does not create a genuine issue of material fact.").

employees she has identified as comparators at the time of their alleged receiving errors. Nor has Ms. Latif shown that either Ms. Sladinski or Mr. Wilson, the relevant decisionmakers who issued her the 30-day suspension and discharge, were responsible for the decision(s) not to discipline Ms. Latif's identified comparators for their alleged receiving errors, or, in fact, if they even had knowledge at the time they made the decisions to suspend and terminate her of all the alleged errors Ms. Latif has attributed to her proffered comparators.

Ms. Sladinksi testified, for example, that she made disciplinary decisions only if the disciplinary action at issue was severe, the employee's direct supervisor was not available that day, or if the union or Human Resources specifically requested her involvement.  Accordingly, while Ms. Sladinski was included on some of the emails submitted by Ms. Latif as evidence of other employees' receiving errors, Ms. Latif has failed to show that Ms. Sladinski was responsible for deciding whether to discipline those employees in those instances or that she was aware of any alleged errors not reflected in the emails on which she was copied.  Likewise, Ms. Latif has not shown that Mr. Wilson was involved in any disciplinary decisions at the initial steps of FCA's progressive discipline policy or had knowledge of any of the receiving errors she attributes to her proffered comparators.  Lacking specific evidence establishing that Ms. Sladinski and Mr. Wilson were aware of any other employee(s) making repeated mistakes commensurate in seriousness to hers, Ms. Latif has failed to show that any similarly situated white employee was treated more favorably.  *See Miller v. Express, LLC*, No. 3:19-cv-50341, 2021 WL 3737734, at *7 (N.D. Ill. Aug. 24, 2021) ("[I]f facts giving rise

to a comparison between differently treated employees is supposed to imply discrimination because of a protected class, then those facts must be known by the person responsible for making the adverse employment decision."); *see also Gaines v. K-Five Const. Corp.*, 742 F.3d 256, 263 (7th Cir. 2014) (holding that defendant was entitled to summary judgment because no evidence showed that the decisionmakers knew about comparators' behavior).

Ms. Latif cites no other evidence in support of her claim that FCA's proffered nondiscriminatory reason for her termination is pretextual.  Because, for the reasons detailed above, Ms. Latif has not adduced sufficient evidence to show that her purported comparators were in fact similarly situated to her or that FCA's decisionmakers had knowledge at the time they suspended and terminated her that any white employee had a similar record of failing to timely receive in parts, any differential treatment she may have received does not support an inference of discrimination.  For this same reason, viewing the evidence as a whole, no reasonable jury could find that Ms. Latif was fired for any reason other than that she routinely failed to timely receive in parts as her job duties required.  Accordingly, FCA is entitled to summary judgment on Ms. Latif's Title VII and § 1981 discrimination claims.

### B.  Retaliation Claims

We turn next to Ms. Latif's claim that FCA suspended and terminated her in retaliation for her having filed a previous EEOC charge and employment discrimination lawsuit against the company.  To succeed on such a claim under Title VII or § 1981, Ms. Latif "must demonstrate that she engaged in protected activity, that she suffered an

adverse action, and that there is a causal connection between the two." *Rowlands v. United Parcel Service – Fort Wayne*, 901 F.3d 792, 801 (7th Cir. 2018) (internal citation and quotation marks omitted). Ms. Latif also must establish that retaliation was the "but for" reason for her termination. *Chatman v. Bd. of Educ. of City of Chicago*, 5 F.4th 738, 748–49 (7th Cir. 2021). Here, it is undisputed that Ms. Latif engaged in statutorily protected activity while employed by FCA and that she was subsequently suspended and terminated. Accordingly, the only element in dispute here is causation.

To prove causation, Ms. Latif relies exclusively on the same comparator evidence discussed in connection with her discrimination claim, which evidence she contends establishes that FCA did not discipline similarly situated white employees for committing the same kinds of errors for which she was routinely disciplined and eventually suspended and fired. Although comparator evidence can, in some cases, support an inference of retaliation, Ms. Latif has failed to satisfy her burden to so demonstrate here. For the same reasons previously discussed in Part II.A. *supra*, Ms. Latif has not adduced sufficient evidence to show that her purported comparators were in fact similarly situated to her; therefore, any differential treatment she may have received is not probative of a retaliatory animus. Ms. Latif has presented no other evidence of causation. To the contrary, the significant lapse in time—more than a year—between Ms. Latif's protected activity and her suspension and termination is wholly insufficient to support an inference of retaliation; in fact, it tends to point to the opposite conclusion. *See Everroad v. Scott Truck Sys., Inc.*, 604 F.3d 471, 481 (7th Cir. 2010) (affirming summary judgment because

year-long delay between protected activity and adverse employment action insufficient to establish a causal link in the absence of other causal evidence).

For these reasons, FCA is entitled to summary judgment on Ms. Latif's Title VII and § 1981 retaliation claims.

## III.    Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment [Dkt. 49] is <u>GRANTED</u>.  All other pending motions are denied as moot.  Final judgment shall enter accordingly.

IT IS SO ORDERED.

Date: _____2/9/2022_____           _Sarah Evans Barker_____
                                                    SARAH EVANS BARKER, JUDGE
                                                    United States District Court
                                                    Southern District of Indiana

Distribution:

Zachary A. Ahonen
JACKSON LEWIS PC (Indianapolis)
zachary.ahonen@jacksonlewis.com

Michael W. Padgett
JACKSON LEWIS PC (Indianapolis)
michael.padgett@jacksonlewis.com

Gregory A. Stowers
STOWERS & WEDDLE PC
gstowers@stowersandweddle.com